## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF OHIO

|  |  |
|---|---|
| MATTHEW SCIABACUCCHI, derivately on behalf of TRANSDIGM GROUP, INC., | : <br> : <br> : <br> : |
| Plaintiff, | : <br> : |
| v. | : <br> : |
| W. NICHOLAS HOWLEY, MERVIN DUNN, SEAN P. HENNESSY, DOUGLAS W. PEACOCK, JOHN STAER, WILLIAM DRIES, MICHAEL S. GRAFF, RAYMOND F. LAUBENTHAL, ROBERT J. SMALL, KEVIN M. STEIN, and TERRANCE M. PARADIE, | : <br> : <br> : <br> : <br> : <br> : <br> : <br> : |
| Defendants, | : <br> : |
| and | : <br> : |
| TRANSDIGM GROUP, INC., | : <br> : |
| Nominal Defendant. | : |

Civil Action No. 1:17-CV-1971

**JURY TRIAL DEMANDED**

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Matthew Sciabacucchi ("Plaintiff"), by and through his undersigned attorneys, hereby submits this Verified Shareholder Derivative Complaint (the "Complaint") for the benefit of nominal defendant TransDigm Group, Inc. ("TransDigm") against certain current and former members of its Board of Directors (the "Board") and executive officers seeking to remedy defendants' breaches of fiduciary duties and unjust enrichment, from at least May 2016 through the present (the "Relevant Period").  Plaintiff makes these allegations upon personal knowledge and the investigation of counsel, which included, among other things, review and analysis of: a) public filings made by TransDigm and other related parties and non-parties with the Securities and Exchange Commission ("SEC"); b) press releases and other publications disseminated by certain of the defendants and other related non-parties; c) news articles, shareholder

communications, and postings on TransDigm's website concerning the Company's public statements; d) pleadings, papers, and any documents filed with and publicly available from a related pending securities fraud class action in the U.S. District Court for the Northern District of Ohio, captioned *City of Hollywood Firefighters' Pension Fund v. TransDigm Group, Inc., et al.*, Case No. 1:17-cv-01677-DCN (the "Securities Action"); and e) other publicly available information concerning TransDigm and the defendants. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      According to its public filings, TransDigm designs, produces, and supplies aircraft components to customers around the globe.  Notably, the Company's largest customer is the U.S. Government.  TransDigm is a roll-up whose growth is contingent on acquiring low-priced, proprietary aerospace products and immediately increasing prices exponentially, a model similar to that utilized by many in the specialty pharmaceutical industry to rapidly increase prices on specialty drugs with limited alternatives.  It is not surprising then that about 90% of TransDigm's net sales for fiscal year 2016 were generated by proprietary products and about 80% of net sales were generated from products for which the Company is the sole source provider.

2.      Beginning by at least May 2016, defendants engaged in an illegal scheme to artificially inflate TransDigm's growth and profitability by price gouging the U.S. Government. TransDigm has recently been accused of operating as a hidden monopoly and of engaging in waste, abuse, and fraud against the government.  Specifically, the Company has engaged in a series of unreasonable price increases for products for which it is the only supplier and also

disguised its cost structure and identity from Pentagon procurement officers, in violation of the rules governing the bidding on such government contracts.

3.     TransDigm operates as a private-equity-like business that has historically focused on acquiring companies that make high-margin, but relatively low-priced proprietary aerospace products with significant aftermarket sales.  This strategy has allowed TransDigm to raise prices and fly under the radar by not affecting the overall price of an airplane so drastically that it would attract scrutiny.

4.     By using an elaborate web of exclusive distributors and hidden subsidiaries, TransDigm was able to covertly acquire sole source manufacturers and exponentially increase the price of its goods without government procurement officials taking notice.

5.     First, by utilizing exclusive distributors, TransDigm adds a buffer between its manufacturing subsidiary and the government, making it more difficult for the contracting officer to access cost and pricing data.  Because these bids are technically "competitive," they are less likely to attract government attention.

6.     Second, federal regulations require government contractors who register with the System for Award Management ("SAM") database to disclose whether they are owned by another entity.  On November 1, 2014, a new subpart was added to the Federal Acquisition Regulations that requires all registrants in the SAM database to disclose whether they are owned by another entity and to identify the parent entity by legal name and by the parent entity's unique Commercial and Government Entity code.  The purpose is to track the government's total spending across a specific company and obtain more insight into supply chain traceability.  However, at least 12 TransDigm subsidiaries failed to disclose TransDigm as a parent despite the fact that TransDigm listed 9 of them as subsidiaries in its own SEC filings.

7.     By failing to list TransDigm as a parent entity, these subsidiaries prevented the government from linking price increases across a range of seemingly separate companies to one single entity (TransDigm), a practice that could affect procurement decisions.

8.     On January 20, 2017, Citron Research ("Citron") issued a report accusing TransDigm of being the "Valeant of the aerospace industry" (the "Citron Report").  The Citron Report disclosed that the Company uses multiple shell distributors that have no pricing power to avoid detection by making government bids seems competitive.  The Citron Report further emphasized that TransDigm's growth was driven, in large part, by rampant acquisitions and extreme debt levels.  In reaction to the Citron Report, which finally uncovered the Company's illicit practices, TransDigm's share price dropped $24.86 per share, or nearly 10%, from $251.76 per share on January 19, 2017 to $226.90 per share on January 20, 2017 – wiping out $1.2 billion in market capitalization in one trading day.

9.     On March 9, 2017, Citron published a second report alleging that TransDigm subsidiaries had failed to disclose that they were owned by TransDigm when bidding for Pentagon contracts, in violation of numerous laws and regulations (the "Second Citron Report"). The Second Citron Report also alleged that TransDigm's Chief Executive Officer ("CEO"), defendant W. Nicholas Howley ("Howley"), is using a private equity fund managed by one of his children, Bratenahl Capital Partners, to hold ownership interests in numerous aviation businesses.  The Second Citron Report further alleges that defendant Howley is the sole investor in the fund.

10.     In reaction to the Second Citron Report, TransDigm stock dropped $10.26 per share, or 4.25%, to a close of $231.37 per share on March 10, 2017.

11.     In the wake of this information, Tim Ryan, a Congressman from Ohio, wrote to the U.S. Department of Defense's ("DOD") Inspector General demanding an investigation.  On March 21, 2017, Congressman Ro Khanna ("Rep. Khanna") also sent a letter to the DOD Inspector General asking for an investigation into TransDigm's business practices.  Rep. Khanna noted the recent news reports regarding TransDigm's "hidden monopol[y]" and urged the DOD to ensure that military funding does not benefit "a few individual financiers" at the expense "of our troops and weapons systems."

12.     In response to Rep. Khanna's letter, TransDigm shares dropped another $23.09 per share, or 9.7%, to close at $214.85 per share on March 22, 2017.

13.     On June 12, 2017, TransDigm's stock declined once again after Senator Elizabeth Warren echoed Rep. Khanna's concerns, and also sent a letter to the DOD requesting the commencement of an investigation into the Company's practices.  Senator Warren's letter caused TransDigm shares to decline 3%.

14.     As further detailed below, throughout the Relevant Period, defendants caused the Company to make false and/or misleading statements, and/or failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, defendants made false and/or misleading statements and/or failed to disclose that: (1) TransDigm's growth and profitability were artificially inflated as a result of its illicit business practices; (2) the Company used exclusive distributors to make noncompetitive government bids seems competitive; (3) TransDigm subsidiaries failed to list TransDigm as a parent entity when submitting government bids; and (4) as a result of the foregoing, defendants' statements about TransDigm's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.

As a result of this scheme, defendants were able to artificially inflate the Company's financials throughout the Relevant Period.

15.     Accordingly, the Company has been damaged.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(2) in that Plaintiff and Defendants are citizens of different states and the matter in controversy exceeds $75,000.00, exclusive of interests and costs.

17.     This Court has personal jurisdiction over each of the defendants because each is either a corporation conducting business and maintaining operations in this District, or is an individual who is either present in this District for jurisdictional purposes, or has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

18.     Venue is proper in this district pursuant to 28 U.S.C.§ 1391 because a substantial portion of the transactions and wrongs complained of herein, including the Defendants' primary participation in the wrongful acts detailed herein, occurred in this district. Moreover, one or more of the Defendants either reside in or maintains executive offices in this district, and Defendants have received substantial compensation in this district by engaging in numerous activities and conducting business here, which had an effect in this district.

## PARTIES

19.     Plaintiff is a current shareholder of TransDigm and has continuously held TransDigm stock since March 2016. Plaintiff is a citizen of Pennsylvania.

20.     Nominal party TransDigm is a Delaware corporation with its principal executive offices located at 1301 East 9th Street, Suite 3000, Cleveland, Ohio 44114.

21.     Defendant Howley has served as the Company's CEO since December 2005 and Chairman of the Board since 2003.  Defendant Howley is a co-founder of the Company.  Upon information and belief, defendant Howley is a citizen of Ohio.

22.     Defendant Mervin Dunn ("Dunn") has served as a director of the Company since 2007.  Upon information and belief, defendant Dunn is a citizen of Ohio.

23.     Defendant Sean P. Hennessy ("Hennessy") has served as a director of the Company since 2006.  In addition, defendant Hennessy served as the chairman of the Board's Audit Committee (the "Audit Committee") during the Relevant Period.  Upon information and belief, defendant Hennessy is a citizen of Ohio.

24.     Defendant Douglas W. Peacock ("Peacock") has served as a director of the Company since 2003.  Upon information and belief, defendant Peacock is a citizen of Florida.

25.     Defendant John Staer ("Staer") has served as a director of the Company since 2012. In addition, defendant Staer served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Staer is a citizen of Denmark.

26.     Defendant William Dries ("Dries") has served as a director of the Company since 2011.  In addition, defendant Dries served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Dries is a citizen of North Carolina.

27.     Defendant Michael S. Graff ("Graff") has served as a director of the Company since 2003.  Upon information and belief, defendant Graff is a citizen of New York.

28.     Defendant Raymond F. Laubenthal ("Laubenthal") has served as a director of the Company since 2015.  Upon information and belief, defendant Laubenthal is a citizen of Ohio.

29.     Defendant Robert J. Small ("Small") has served as a director of the Company since 2010.  In addition, defendant Small served as a member of the Audit Committee during the Relevant Period.  Upon information and belief, defendant Small is a citizen of Massachusetts.

30.     Defendant Kevin M. Stein ("Stein") has served as the Company's Chief Operating Officer ("COO") since his hiring in 2014 and was named President of the Company in 2016. Upon information and belief, defendant Stein is a citizen of Ohio.

31.     Defendant Terrance M. Paradie ("Paradie") has served as the Company's Chief Financial Officer ("CFO") since 2015.  Upon information and belief, defendant Paradie is a citizen of Ohio.

32.     Collectively, Defendants Hennessy, Staer, Dries and Small are referred to herein as the "Audit Committee Defendants."

33.     Collectively, defendants Howley Hennessy, Staer, Dries, Small, Dunn, Peacock, Graff, Laubenthal, Paradie and Stein are referred to herein as the "Defendants."

### DEFENDANTS' DUTIES

34.     By reason of their positions as officers, directors, and/or fiduciaries of TransDigm, and because of their ability to control the business and corporate affairs of TransDigm, Defendants owed TransDigm and its shareholders fiduciary obligations of good faith, loyalty, and candor, and were and are required to use their utmost ability to control and manage TransDigm in a fair, just, honest, and equitable manner.

35.     Further, Defendants were and are required to act in furtherance of the best interests of TransDigm and its shareholders so as to benefit all shareholders equally, and not in furtherance of their personal interest and benefit.  Each director and officer of the Company owes to TransDigm and its shareholders the fiduciary duty to exercise good faith and due diligence in

the administration of the affairs of the Company, and in the use and preservation of its property and assets, as well as the highest obligation of fair dealing.

36.     Because of their positions of control and authority as directors and/or officers of TransDigm, having knowledge of material non-public information regarding the Company, Defendants were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein.  To discharge their duties, the officers and directors of TransDigm were required to exercise reasonable and prudent supervision over the management, policies, practices and controls of the Company.  By virtue of such duties the officers and directors of TransDigm were required to, among other things:

   a.     Exercise good faith to ensure that the affairs of the Company were conducted in an efficient, business-like manner so as to make it possible to provide the highest quality performance of their business;

   b.     Exercise good faith to ensure that the Company was operated in a diligent, honest and prudent manner, and complied with all applicable federal and state laws, rules, regulations and requirements, and all contractual obligations, including acting only within the scope of its legal authority and disseminating truthful and accurate statements to the investing public;

   c.     Properly and accurately guide investors and analysts as to the true financial condition of the Company at any given time, including making accurate statements about the Company's financial results; and

   d.     When put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

37.     Additionally, the Audit Committee Defendants are subject to the responsibilities imposed on them by the Company's Audit Committee Charter, which describes the Audit Committee's purpose "is to provide assistance to the Board of Directors in fulfilling the Board's oversight responsibilities on matters relating to… the Company's compliance with legal and

regulatory requirements." The Audit Committee Charter imposes the following responsibilities on the Audit Committee:

a.   Establish and oversee procedures for (a) the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters and (b) the confidential, anonymous submission by employees of concerns regarding questionable accounting or auditing matters;

b.   Review with management the annual audited financial statements and quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and any other matters required to be reviewed by the Audit Committee under applicable legal, regulatory or New York Stock Exchange requirements. Such review shall include a review of any audit problems or difficulties and management's response thereto, such as any significant disagreements with management regarding generally accepted accounting principles or other matters, material adjustments to the financial statements recommended by the independent auditor and adjustments that were noted or proposed by the auditor but were "passed," regardless of materiality;

c.   Review generally with management the type of information to be disclosed and the type of presentation to be made in the Company's earnings press releases and in financial information and earnings guidance provided to analysts and ratings agencies;

d.   Review (i) significant issues regarding accounting principles and financial statement presentations, including any significant change in the Company's selection or application of accounting principles, and significant issues as to the adequacy of the Company's internal controls and any special audit steps adopted in light of material control deficiencies, (ii) analyses prepared by management or the independent auditor setting forth significant financial reporting issues and judgments made in connection with the preparation of the financial statements, including analyses of the effects of alternative GAAP methods in the financial statements, and (iii) the effect of regulatory and accounting initiatives, as well as off-balance sheet structures, on the Company's financial statements and other public disclosures; and

e.   Prepare annually any reports required by the rules of the SEC to be included in the Company's annual proxy statement.

38.     Defendants are also subject to TransDigm's Code of Business Conduct (the "Code"), which requires that all employees, including Defendants, comply with applicable laws and regulations.  Moreover, the Code requires the following:

*Securities Laws*

These laws require that accurate information be given to the public and prohibit employees, officers and directors from misusing information that is not available to the public.  Employees, officers and directors shall endeavor to provide information that is full, fair, accurate, timely and understandable in all reports and documents that the Company files with, or submits to, the Securities and Exchange Commission as well as other public filings or communications made by the Company.  It is a violation of both criminal and civil laws for any employee, officer, or director to engage in any securities trading while in possession of material non-public information.  All such information should be kept strictly confidential.

## SUBSTANTIVE ALLEGATIONS

### A.    **Company Background**

39.     According to its public filings, TransDigm designs, produces, and supplies aircraft components worldwide.  The Company's largest customer is the U.S. government, with Boeing and Airbus following suit.  Although TransDigm's parts are designed into and sold as original aircraft equipment, 55% of the Company's revenues are generated from recurring aftermarket sales over the life of an aircraft.

40.     TransDigm's government bids and contracts are subject to intense scrutiny and a host of regulations.  Companies that fail to comply with these regulations are subject to stiff civil and criminal penalties.  On government contracts for which the price is based on cost, the U.S. Government has the ability to review TransDigm's costs and performance, as well as its accounting and general business practices.  Based on the results of such audits, the U.S. Government may adjust the Company's contract-related costs and fees, including indirect costs.

Furthermore, even where the price of a good sold is not based on cost, the U.S. Government may seek to review TransDigm's costs to determine whether its pricing is "fair and reasonable."

### B.    Defendants' False and Misleading Statements

41.    On May 10, 2016, Defendants caused the Company to issue a press release announcing its financial results for the second quarter ended April 2, 2016.  Net sales for the quarter rose 28.7%, or $177.8 million, to $796.8 million from $619.0 million in the comparable quarter in the previous year.  Adjusted net income for the quarter rose 34.1% to $160.5 million, or $2.86 per share, from $119.7 million, or $2.11 per share, in the comparable quarter in the previous year.  The Company also reported earnings per share of $2.47, up 26.0% year-over-year. Commenting on TransDigm's second quarter results, defendant Howley stressed:

> We saw signs of improvement in the commercial aftermarket as second quarter sales rose sharply versus the prior year.  After a number of quarters of disconnect, these results are encouraging.  The defense picture was mixed with sales slightly down versus the prior year quarter, but bookings were up significantly.

42.    On May 11, 2016, Defendants caused the Company to file its Form 10-Q with the SEC for the period ended April 2, 2016 ("2Q2016 Form 10-Q"), signed by defendants Howley and Paradie.  The 2Q2016 Form 10-Q reaffirmed the Company's second quarter 2016 financial results.

43.    In addition, pursuant to the Sarbanes-Oxley Act of 2002, the 2Q2016 Form 10-Q contained signed certifications ("SOX Certifications") by defendants Howley and Paradie, stating that the financial information contained in the 2Q2016 Form 10-Q was accurate, and that any material changes to the Company's internal control over financial reporting were disclosed. The SOX Certifications set forth:

> I, [W. Nicholas Howley/Terrance M. Paradie], certify that:
>
> 1.  I have reviewed this quarterly report on Form 10-Q of TransDigm Group Incorporated;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    (a) designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    (b) designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    (c) evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    (d) disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's fourth fiscal quarter that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's Board of Directors:

(a) all significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize and report financial information; and

(b) any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

\*   \*   \*

In connection with the Quarterly Report on Form 10-Q of TransDigm Group Incorporated (the "Company") for the period ended April 2, 2016 as filed with the Securities and Exchange Commission on the date hereof (the "Report"), I, [W. Nicholas Howley, Chairman of the Board of Directors, President and Chief Executive Officer (Principal Executive Officer)/Terrance M. Paradie, Executive Vice President and Chief Financial Officer (Principal Financial and Accounting Officer)] certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

1.  The Report fully complies with the requirements of Section 13(a) or 15(d) of the Securities and Exchange Act of 1934; and

2.  The information contained in the Report fairly presents in all material respects, the financial condition of the Company as of the dates indicated and results of operations of the Company for the periods indicated.

44.      On August 9, 2016, Defendants caused the Company to issue a press release announcing its financial results for the third quarter ended July 2, 2016.  Net sales for the quarter rose 15.4%, or $106.3 million, to $797.7 million from $691.4 million in the comparable quarter in the previous year.  Net income for the quarter rose 41.9% to $140.6 million, or $2.52 per share, compared to $99.1 million, or $1.75 per share, in the comparable quarter in the previous year.  The press release attributed the increase in net income to sales growth and "improvements to [its] operating margin resulting from the strength of [its] proprietary products and continued productivity efforts."  Defendant Howley also commented on TransDigm's third quarter 2016 results, stating: "We are encouraged to see continuing improvement in the commercial aftermarket . . . Our strong third quarter EBITDA as Defined margin of 48.1% continues to

reflect the strength of our proprietary products and our continued focus on intrinsic value creation."

45.     On November 14, 2016, Defendants caused the Company to issue a press release announcing its financial results for the fourth quarter and fiscal year ended September 30, 2016. Net sales for the quarter rose 8.1%, or $65.4 million, to $875.2 million from $809.8 million in the comparable quarter a year ago.  Net income for the quarter rose 9.2% to $154.7 million, or $2.77 per share, compared to $141.7 million, or $2.50 per share, in the comparable quarter a year ago.  For fiscal year 2016, net sales increased 17.2% to $3,171.4 million from $2,707.1 million in the comparable period last year.  Fiscal 2016 net income increased 31.1% to $586.4 million, or $10.39 per share, compared with $447.2 million, or $7.84 per share, in the comparable period last year.  Defendants attributed the increase in net income to sales growth, "improvements to [the Company's] operating margin resulting from the strength of [its] proprietary products, continued productivity efforts and favorable product mix," and a lower effective tax rate.

46.     On November 15, 2016, Defendants caused the Company to file its Annual Report on Form 10-K with SEC ("2016 Form 10-K").  The 2016 Form 10-K was signed by Defendants Paradie, Howley, Dries, Dunn, Graff, Hennessy, Peacock, Small, Staer and Laubenthal and reaffirmed the Company's fourth quarter and fiscal year 2016 financial results. The 2016 Form 10-K discussed "Competition" within the aerospace industry and how TransDigm has been able to position itself for success, stating in relevant part:

> The niche markets within the aerospace industry that we serve are relatively fragmented and we face several competitors for many of the products and services we provide. Due to the global nature of the commercial aircraft industry, competition in these categories comes from both U.S. and foreign companies. Competitors in our product offerings range in size from divisions of large public corporations to small privately-held entities with only one or two components in their entire product portfolios.

*We compete on the basis of engineering, manufacturing and marketing high quality products, which we believe meet or exceed the performance and maintenance requirements of our customers, consistent and timely delivery, and superior customer service and support*. The industry's stringent regulatory, certification and technical requirements, and the investments necessary in the development and certification of products, create barriers to entry for potential new competitors. As long as customers receive products that meet or exceed expectations and performance standards, we believe that they will have a reduced incentive to certify another supplier because of the cost and time of the technical design and testing certification process. In addition, we believe that the availability, dependability and safety of our products are reasons for our customers to continue long-term supplier relationships.

47.     In addition, the 2016 Form 10-K contained SOX Certifications, signed by defendants Howley and Paradie, which were substantially similar to those set forth above.

48.     The statements referenced above were materially false and/or misleading because they misrepresented and failed to disclose material adverse facts pertaining to the Company's business and operations, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) TransDigm's growth and profitability were artificially inflated as a result of its illicit business practices; (2) the Company used exclusive distributors to make noncompetitive government bids seems competitive; (3) TransDigm subsidiaries failed to list TransDigm as a parent entity when submitting government bids; and (4) as a result of the foregoing, Defendants' statements about TransDigm's business, operations, and prospects were false and misleading and/or lacked a reasonable basis.  As a result of this fraudulent scheme, Defendants were able to artificially inflate the Company's financials throughout the Relevant Period.

### C.     The Truth Emerges

49.     On January 20, 2017, the Citron Report was published, titled "Could TransDigm be the Valeant of the Aerospace Industry?"  The Citron Report accused the Company of price gouging the U.S. Government.  According to the Citron Report, TransDigm acquires airplane

16

parts companies (over 50 in total), proceeds to fire the employees of the newly acquired companies, and egregiously raises the prices of the newly acquired products.  Further, the Citron report stated that this business model, which has made TransDigm a dominant supplier of airplane parts to the aerospace industry, has burdened the Company's balance sheet with a "sky-high debt load."  The "only thing shielding TransDigm from revealing negative organic growth of close to -10%" is the "aggressive year-over-year price increases," as any U.S. Government pressure will expose the Company to revenue contraction and "a devastating cut in EPS."

50.　　The following demonstrates the "aggressive" price increases referred to by the Citron Report:

| Company | Part | Pre-Acquisition Price | Post-Acquisition Price |
|---------|------|----------------------|------------------------|
| Aerosonic | Vibration Panel | $67.33 | $271.00 |
| Arkwin | Pawl | $972.00 | $1950.00 |
| Harco | Cable Assembly | $1737.03 | $7863.60 |
| Skurka | Connector | $310.00 | $1109.82 |
| Whippany | Motor Rotor | $654.46 | $5474.00 |

51.　　The Citron Report emphasized that the "easiest way for the government to encourage competitive bidding would be to audit the bidding process."  A simple audit would reveal how "TransDigm has been able to use the guise of multiple shell distributors, who have no pricing power, to make a bid seem competitive when in reality they are all shills for TransDigm."

52.　　On this news, TransDigm stock declined $24.86 per share, or nearly 10%, to a close at $226.90 per share on January 20, 2017, wiping out over $1.2 billion in market capitalization.

53.　　On March 9, 2017, Citron published the Second Citron Report alleging that TransDigm subsidiaries had failed to disclose that they were owned by TransDigm when bidding for Pentagon contracts, in violation of numerous laws and regulations.  The Second Citron

Report also alleged that TransDigm's CEO, defendant Howley, is using a private equity fund managed by one of his children, Bratenahl Capital Partners, to facilitate hold ownership interests in numerous aviation businesses.  The Second Citron Report further alleges that defendant Howley is the sole investor in the fund.

54.     In reaction to Second Citron Report, TransDigm stock dropped $10.26 per share, or 4.25%, to a close of $231.37 per share on March 10, 2017.

55.     In the wake of this information, Tim Ryan, a Congressman from Ohio, wrote to the DOD Inspector General demanding an investigation. On March 21, 2017, Rep. Khanna  also sent a letter to the DOD Inspector General asking for an investigation into TransDigm's business practices.   Rep. Khanna noted the recent news reports regarding TransDigm's "hidden monopol[y]" and urged the DOD to ensure that military funding does not benefit "a few individual financiers" at the expense "of our troops and weapons systems."

56.     Rep. Khanna further wrote:

> TransDigm appears to use a range of methods to evade these protections.  For example, according to reports, TransDigm avoids showing that it is a monopoly provider of parts by setting up a network of captive distributors that mimic the aesthetic of a competitive market. Despite the illusion of competition, distributors that provide TransDigm parts, for the most part, are buying from one TransDigm subsidiary, and that subsidiary sets its price to distributors.   The procurement officer, however, sees multiple sellers of the product, without realizing that he or she is in fact buying from a monopoly.  Thus, the officer does not know to ask for the cost structure….In fact, your office identified exclusive distributors as problematic in a 2008 audit of Dutch Valley, which is a TransDigm distributor. You concluded in 2008: "We do not believe the current exclusive distributor model is a viable procurement alternative for the DOD." (internal citations omitted).

57.     In response to Rep. Khanna's letter, TransDigm shares dropped another $23.09 per share, or 9.7%, to close at $214.85 per share on March 22, 2017.

58.    On June 12, 2017, TransDigm's stock declined once again after Senator Elizabeth Warren echoed Rep. Khanna's concerns, and also sent a letter to the DOD requesting the commencement of an investigation into the Company's practices.   Senator Warren's letter caused TransDigm shares to decline 3%.

## DERIVATIVE AND DEMAND ALLEGATIONS

59.    Plaintiff brings this action derivatively in the right and for the benefit of TransDigm to redress the breaches of fiduciary duty and other violations of law by Defendants.

60.    Plaintiff will adequately and fairly represent the interests of TransDigm and its shareholders in enforcing and prosecuting its rights.

61.    The Board currently consists of the following nine (9) directors: Howley, Dunn, Hennessy, Peacock, Staer, Dries, Graff, Laubenthal, and Small.   Plaintiff has not made any demand on the present Board to institute this action because such a demand would be a futile, wasteful and useless act, for the following reasons:

> a.    During various times of the Relevant Period, defendants Hennessy, Staer, Dries, and Small served on the Company's Audit Committee.  Pursuant to the Company's Audit Committee Charter, the members of the Audit Committee were and are responsible for, *inter alia*, reviewing the Company's annual and quarterly financial reports,reviewing the integrity of the Company's internal controls and ensuring "the Company's compliance with legal and regulatory requirements."  Defendants Hennessy, Staer, Dries, and Small breached their fiduciary duties of due care, loyalty, and good faith, because the Audit Committee, inter alia, allowed or permitted the Company to disseminate false and misleading statements in the Company's SEC filings and other disclosures and caused the above-discussed internal control failures.  Therefore, defendants Hennessy, Staer, Dries, and Small each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile;

> b.    The principal professional occupation of defendant Howley is his employment with TransDigm as its CEO, pursuant to which he has received and continues to receive substantial monetary compensation and other benefits.  Howley is also a named defendant in the Securities Action.  In addition, according to the Company's Proxy Statement filed with the SEC on January 20, 2017 (the "2016 Proxy"), Defendants have admitted that

defendant Howley is not independent. Thus, defendant Howley lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action;

c.   During the Relevant Period, defendant Laubenthal served as TransDigm's President and COO, pursuant to which he received substantial monetary compensation and other benefits. In addition, according to the Company's Proxy Statement filed with the SEC on January 20, 2017 (the "2016 Proxy"), Defendants have admitted that defendant Howley is not independent. Thus, defendant Laubenthal lacks independence from demonstrably interested directors, rendering him incapable of impartially considering a demand to commence and vigorously prosecute this action; and

d.   Defendants Howley, Dries, Dunn, Graff, Hennessy, Peacock, Small, Staer and Laubenthal (the entire Board) signed the false and misleading 2016 10-K. The 2016 10-K was false and misleading because (among other things) it failed to disclose that: (i) TransDigm's growth and profitability were artificially inflated as a result of its illicit business practices; (2) the Company used exclusive distributors to make noncompetitive government bids seems competitive; (3) TransDigm subsidiaries failed to list TransDigm as a parent entity when submitting government bids; and (4) as a result of the foregoing, Defendants' statements about TransDigm's business, operations, and prospects were false and misleading and/or lacked a reasonable basis; and it made false and misleading statements regarding the Company's internal controls. Therefore, defendants Howley, Dries, Dunn, Graff, Hennessy, Peacock, Small, Staer and Laubenthal each face a substantial likelihood of liability for their breach of fiduciary duties and any demand upon them is futile.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duties
### for Disseminating False and Misleading Information

62.   Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

63.   As alleged in detail herein, each of the Defendants violated and breached their fiduciary duties of care, loyalty, and good faith by causing or allowing the Company to disseminate to TransDigm shareholders materially misleading and inaccurate information through, *inter alia*, SEC filings, press releases, conference calls and other public statements and

disclosures as detailed herein.  These actions could not have been a good faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

64.    As a direct and proximate result of Defendants' foregoing breaches of fiduciary duties, the Company has suffered significant damages.  Thus, as a result of the misconduct alleged herein, Defendants are liable to the Company.

**COUNT II**

**Against All Defendants for Breach of Fiduciary Duties for
Failing to Maintain Internal Controls**

65.    Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

66.    As alleged in detail herein, each of the Defendants had a fiduciary duty to, among other things, exercise good faith to ensure that the Company's financial statements were prepared in accordance with GAAP, and, when put on notice of problems with the Company's business practices and operations, exercise good faith in taking appropriate action to correct the misconduct and prevent its recurrence.

67.    Defendants, most notably those serving on the Board's Audit Committee, willfully ignored the known and pervasive problems with TransDigm's internal controls and practices and procedures and failed to make a good faith effort to correct these problems or prevent their recurrence.

68.    As a direct and proximate result of the Defendants foregoing breaches of fiduciary duties, the Company has suffered significant damages.  Thus, as a result of the misconduct alleged herein, the Defendants are liable to the Company.

## COUNT III

### Against All Defendants for Unjust Enrichment

69.     Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

70.     By their wrongful acts and omissions, the Defendants were unjustly enriched at the expense of and to the detriment of TransDigm.

71.     Plaintiff, as a shareholder and representative of TransDigm, seeks restitution from the Defendants, and each of them, and seeks an order of this Court disgorging all profits, benefits, and other compensation obtained by the Defendants, and each of them, as a result of their wrongful conduct and fiduciary breaches.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment as follows:

A.     Declaring that Plaintiff may maintain this derivative action on behalf of TransDigm and that Plaintiff is a proper and adequate representative of the Company;

B.     Against Defendants and in favor of the Company for the amount of damages sustained by the Company as a result of Defendants' breaches of fiduciary duties;

C.     Directing TransDigm to take all necessary actions to reform and improve its corporate governance and internal procedures to comply with applicable law and to protect the Company and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

D.      Awarding to TransDigm restitution from Defendants, and each of them, and ordering disgorgement of all profits, benefits and other compensation obtained by the Defendants;

E.      Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

F.      Granting such other and further relief as the Court deems just and proper.


## JURY DEMAND

Plaintiff hereby demands a trial by jury.

Dated:  September 19, 2017

STRAUSS TROY CO., LPA

/s/ Richard S. Wayne

OF COUNSEL:
Richard S. Wayne (0022390)
Joseph J. Braun (0069757)
THE WEISER LAW FIRM, P.C.
The Federal Reserve Building
Robert B. Weiser
150 East Fourth Street, 4th Floor
Brett D. Stecker
Cincinnati, OH 45202-4018
James M. Ficaro
Telephone: (513) 621-2120
22 Cassatt Avenue
Facsimile: (513) 629-9426
Berwyn, PA 19312
E-mail: rswayne@strausstroy.com
Telephone: (610) 225-2677
E-mail: jjbraun@strausstroy.com
Facsimile: (610) 408-8062

RM LAW, P.C.
*Counsel for Plaintiff*
Richard A. Maniskas
1055 Westlakes Dr., Ste. 3112
Berwyn, PA 19312
Telephone: (484) 324-6800

12326910.1